Filed 2/25/16  P. v. Arciga CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>HECTOR AGUILAR ARCIGA et al.,<br><br>    Defendants and Appellants. | B258201<br><br>(Los Angeles County<br>Super. Ct. No. VA114995) |

APPEAL from judgments of the Superior Court of Los Angeles County, John A. Torribio, Judge.  Affirmed.

Brett Harding Duxbury, under appointment by the Court of Appeal, for Defendant and Appellant Hector Aguilar Arciga.

Jennifer Peabody, under appointment by the Court of Appeal, for Defendant and Appellant Pedro Huerta Zuniga.

Waldemar D. Halka, under appointment by the Court of Appeal, for Defendant and Appellant Francisco Argenis Parra.

Kamala D. Harris, Attorney General, Gerard A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and David A. Wildman, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

Appellants Hector Aguilar Arciga, Pedro Huerta Zuniga and Francisco Argenis Parra appeal from judgments and sentences following their convictions for the murder of Carlos Zarate, the attempted murder of Manuel Rojas, and the robbery and burglary of Zarate, Rojas, Jesus Vasquez, and Martha Gutierrez. They contend the trial court erred in not excluding certain out-of-court statements, giving incomplete and/or erroneous jury instructions, and imposing unauthorized sentences. Finding no reversible error, we affirm.

## PROCEDURAL HISTORY

Appellants were charged in an amended information with the murder of Zarate (Pen. Code, §187, subd. (a); count 1),[1] the attempted murder of Rojas (§§ 664/187, subd. (a); count 2), assault with a deadly weapon of Rojas (§ 245, subd. (b); count 3), home invasion robbery of Zarate, Rojas, Gutierrez, and Vasquez (§ 211; counts 6-9), and first degree burglary (§ 459; count 10). Arciga and Zuniga were also charged with possession of a firearm by a felon (§ 12021, subd. (a)(1); counts 4 and 5). As to count 1 (murder of Zarate), it was alleged that the murder was committed in the commission of a robbery and a burglary (§ 190.2, subd. (a)(17)).

With respect to Parra, it was alleged that: as to counts 1, 3, and 10, he personally used a firearm in the commission of a felony (§ 12022.53, subds. (a) & (b)); and as to counts 2, 6, 7, 8, and 9, he personally and intentionally discharged a firearm which caused great bodily injury and death to Zarate (§ 12022.53, subds. (b), (c), & (d)).

With respect to Zuniga, it was alleged that: as to counts 2, 3, and 5 to 10, he personally used a firearm in the commission of a felony (§ 12022.53, subds. (a) &

---

[1] All further statutory citations are to the Penal Code, unless otherwise stated.

(b)); and as to counts 1, 6, 7, 8, and 9, he personally and intentionally discharged a firearm which caused great bodily injury and death to Zarate (§ 12022.53, subds. (b), (c), & (d)). It was further alleged that Zuniga had suffered three prior prison terms.

With respect to Arciga, it was alleged that: as to counts 2 to 10, he personally used a firearm in the commission of a felony (§ 12022.53, subds. (a) & (b)); and as to counts 1, 6, 7, 8, and 9, he personally and intentionally discharged a firearm which caused great bodily injury and death to Zarate (§ 12022.53, subds. (b), (c), & (d)). It was further alleged that Arciga had suffered a prior prison term (§ 667.5, subd. (b)).

A jury was empanelled for Parra and Zuniga, and a separate jury empanelled for Arciga. Parra was found guilty as charged on all counts. The jury found the murder (count 1) to be in the first degree, and found true both special circumstances allegations, viz., that the murder was committed in the commission of a burglary and a robbery. It also found true the personal firearm use allegations.

Similarly, Zuniga was found guilty as charged on all counts. The jury also found the murder to be in the first degree, and found true both special circumstances allegations and all personal firearm use allegations. In a bifurcated proceeding, the trial court found true the three prior prison term allegations.

Arciga was found guilty as charged on counts 1, 4, 6, 7, 8, 9, and 10. He was acquitted of the charges in count 2 (attempted murder of Rojas) and count 3 (assault on Rojas). The jury found the murder to be in the first degree and both special circumstances to be true. It found true the allegations of personal and intentional discharge of a firearm as to counts 1, 6, 7, 8, and 9, and the personal firearm use allegation as to count 10. In a bifurcated proceeding, the trial court found true the prior prison term allegation.

3

As reflected in the abstracts of judgment, the trial court sentenced Parra to life imprisonment without the possibility of parole, plus 40 years; Zuniga to life imprisonment without the possibility of parole, plus 40 years, 8 months; and Arciga to life imprisonment without the possibility of parole, plus 40 years, four months.

Appellants filed timely notices of appeal.

## FACTUAL BACKGROUND

A.  *The Prosecution Case.*

According to the prosecution, appellants had a scheme to rob drug dealers. After gaining a drug dealer's trust by making an initial small purchase, they would set up a larger drug purchase. During this second encounter, they would rob the drug dealer of money and drugs. In the instant case, appellants killed Carlos Zarate and injured Manuel Rojas during the second drug purchase.

1.  *The Victims' Testimony.*

Vasquez testified he was a close friend of Zarate's. About a week and a half before Zarate's murder, Vasquez was present when Zarate sold 20 pounds of marijuana to Parra and Zuniga. On April 22, 2009, Vasquez, Gutierrez (his mother-in-law), Zarate, and Rojas went to an apartment in Bellflower to sell 140 pounds of marijuana to Parra and Zuniga. They brought 60 pounds of the drug with them, and planned to deliver the remainder after receiving the money. Parra was waiting outside the apartment; Zuniga and Arciga were waiting inside. The parties exchanged drugs and money. Arciga checked the product, while Gutierrez started counting the money. She asked Vasquez to assist her. As Vasquez was walking toward Gutierrez, he glimpsed Zuniga pulling a handgun from his waist. He heard several gunshots and saw Zarate staggering. Vasquez also saw Arciga shooting at Zarate while walking toward him. After Zarate had fallen to the

4

ground, Arciga fired five more shots at him. Zuniga then snatched the money from Gutierrez. At around the same time, Vasquez heard Rojas screaming. After another gunshot, Vasquez observed Rojas on the floor. Parra took the bag containing the marijuana and handed it to Zuniga. Zuniga then dragged the bag to the exit. Vasquez did not see Arciga, but presumed that he had already left the apartment. Parra, who was armed with a semi-automatic, pointed the gun at Vasquez, and asked Vasquez if he had a gun. Vasquez told him, "No," and lifted his shirt to show he was not armed. Gutierrez also interposed herself between Parra and Vasquez. As Parra turned to leave, he struck Rojas, who was still on the ground, on the top of the head with his gun. After Parra left, Vasquez ran toward Zarate's body and started screaming to wake him up. He noticed a .45-caliber handgun on top of the body. Vasquez recognized that the gun belonged to him, and took it. He subsequently disposed of the gun. Vasquez, Gutierrez, and Rojas then left the apartment. Vasquez did not call 911 after the shooting or contact the police. Rather, the police contacted him later.

Rojas's and Gutierrez's trial testimony was substantially similar to Vasquez's testimony. Rojas testified that he realized it was a setup when Gutierrez was counting the stacks of money, and there were large bills on top of the stacks and $1 bills underneath. At almost the same instant, Rojas heard someone say, "This is a stick up." He saw Zarate reach for his gun, but Zarate did not have enough time to pull it out before he was shot. After Zarate fell to the ground, Gutierrez yelled out, "Oh, my God. Run. Run." Rojas panicked and ran toward the front door. Arciga then shot him in the left buttocks area, and Rojas fell to the ground. He closed his eyes and pretended to be dead. He heard people walking out and dragging the bag of drugs with them. As the last person left, he pistol-

5

whipped Rojas. From their positions in the apartment, Rojas deduced that it was Parra who had pistol-whipped him.

After the men left, Gutierrez had someone drive Rojas to a nearby hospital, where he had surgery to repair a shattered left femur bone. Police officers interviewed Rojas at the hospital; he told them he had been shot in a driveby shooting by unknown assailants. However, Rojas, who was working as an informant for the Drug Enforcement Administration (DEA), called his handler that day and informed the DEA agent about what had happened. A few days later, Los Angeles Sheriff's Department deputy sheriff and homicide detective Steven Blagg, after being informed that Rojas had pertinent information about the shooting, met with Rojas. Rojas described the actual events to the detective.

Gutierrez testified that when the shooting started, she covered her face. Later, she saw Zuniga pointing a gun at Vasquez. She went over and pushed the gun away from Vasquez's face. Gutierrez did not know that Zarate had died until she was informed a few days later. She did not go to the police. Instead, the police contacted her.

### 2. *Statements Made to Eusebio Alvarez.*

Over appellants' objections under *Aranda-Bruton*,[2] Eusebio Alvarez, a friend of Arciga's, testified about certain statements Arciga and Zuniga had made to him after the shooting. Previously, Arciga had told Alvarez that Arciga and Parra's father were involved in "dope rips" -- robbing drug dealers. On April 22, 2009, Arciga called Alvarez, saying, "I got some weed right now, but you got to let me know if you want it because something went wrong right now. It's hot. I just shot somebody." Later that day, Arciga came to Alvarez's house with some marijuana.

---

[2] *People v. Aranda* (1965) 63 Cal.2d 518; *Bruton v. United States* (1968) 391 U.S. 123 (*Bruton*).

Arciga asked Alvarez if Alvarez could "get rid of [the drugs] quick or something because it was real hot." Arciga said he had been involved in a shoot-out: he had shot a man and after the man fell down, he had walked up and shot him several times. Arciga said Zuniga and Parra were present.

Alvarez testified he did not sell any of the marijuana for Arciga. However, for $100, he helped Arciga dispose of a nine-millimeter handgun Arciga said he had used to kill the man.

A few days later, Zuniga contacted Alvarez, saying he had some crystal methamphetamine he wanted Alvarez to sell. Zuniga admitted there had been a shoot-out, but said Arciga had lied about shooting the victim. He bragged, "[Arciga] is talking all this bullshit. I was the one that did it. I'm the one that shot the guy."

### 3. *Other Trial Testimony.*

Maria Eduvina Arteaga de Ayala testified that she lived at the apartment where the shooting occurred. About a week before the shooting, Arciga and "Miguel" asked about using her apartment to host two people visiting from Mexico. Arciga also asked her if she wanted to work with them as a driver. He showed her a box of cash and a handgun. On April 22, 2009, Miguel called her and stated they wanted her apartment "empty." Ayala left the apartment, leaving the door unlocked. As she was driving away from her apartment that morning, she observed Arciga driving in the opposite direction. Later that day, the manager of the apartment complex called Ayala, and told her there was a dead man in her apartment. When Ayala was later interviewed by Detective Blagg, she initially lied before telling him the truth. Ayala testified she did not want to work with Arciga, and she never gave anyone permission to use her apartment to engage in drug deals or to rob drug dealers.

7

On November 10, 2009, Parra was stopped for speeding. He was arrested for driving without a license and the vehicle was impounded. During the inventory search of the vehicle, two handguns were recovered from the trunk, including a nine-millimeter Sig Sauer. After waiving his *Miranda* rights,[3] Parra told Los Angeles Police Officer Arturo Koenig that he was going to meet and rob a drug dealer of 200 pounds of marijuana. He admitted being involved in a prior robbery of a drug dealer, at "32nd and Central" in Los Angeles.

4.     *Forensic Evidence.*

Steven Scholtz, a coroner, testified that he performed an autopsy on Zarate's body. Zarate had suffered nine gunshot wounds, including three that Scholtz opined were fatal.

Phil Teramoto, a criminalist, testified about firearm-related evidence recovered at the crime scene. From various tests, Teramoto concluded that three firearms were used during the shoot-out: (1) a .45-caliber handgun that fired a single shot, (2) a nine-millimeter handgun that fired eight shots, and (3) a nine-millimeter Sig Sauer -- the handgun recovered from Parra's vehicle -- that fired one shot. A bullet recovered from Rojas's body was matched to bullets fired from the Sig Sauer handgun, and two bullets recovered from Zarate's body were matched with the bullets fired from the other nine-millimeter handgun. Teramoto also testified that the shot fired from the .45-caliber handgun had a northern trajectory and hit an exercise machine at 16.5 inches above the ground.

Los Angeles County Sheriff Deputy Mario Cortez, a latent print examiner, testified that he matched latent prints developed from evidence found at the crime scene with fingerprint exemplars from Parra and Zuniga. Luis Olmos, a criminalist, testified that analysis of DNA found on certain items at the crime scene

---

[3]     *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

indicated that multiple persons handled the items. Based on their respective DNA profiles, Arciga and Zuniga were possible contributors to the DNA mixture found on some of the items.

5. *Evidence Presented Only to Arciga's Jury.*

On March 31, 2010, Detective Blagg and two fellow officers interviewed Arciga following his arrest on an unrelated crime. A recording of the interview was played for the jury. After waiving his *Miranda* rights, Arciga told the officers he had been acquainted with Parra and his father for about two years. According to Arciga, Parra's father was involved in robbing drug dealers. Arciga acted as a lookout during two of these robberies. On one of those occasions, Zuniga was present. Arciga said that by April 2009 he was no longer working with Parra's father or Zuniga. He also denied knowing Zarate, and initially denied ever being in Bellflower. After being informed that he had been identified by several witnesses as a shooter during Zarate's murder and that his cellphone had been used in Bellflower on April 22, 2009, Arciga conceded that he had gone with Parra's father on a drug deal and that they may have gone to Bellflower.

After further questioning, Arciga admitted going to an apartment in Bellflower with Parra's father, Parra, and Zuniga to rob drug dealers. Arciga was not armed, but Parra's father and Zuniga were armed with pistols. At the apartment, they met four drug dealers -- a woman and three men -- who brought 60 pounds of marijuana. Arciga checked the product while the woman counted the money. He heard some commotion and looked up. He saw one of the male drug dealers pull out a pistol, and almost simultaneously Zuniga pulled out his gun. Arciga did not see Zuniga shooting; he just heard shots. Arciga ran out of the apartment with the bag of drugs. As he did so, he saw the drug dealer with the pistol fall to the ground.

9

B. *The Defense Case.*

Arciga and Zuniga did not testify.

Parra testified he had never been to the crime scene. He stated that his father, Armando Parra, was a drug dealer, and that he had helped his father sell drugs. Parra also testified that his father robbed drug dealers, but claimed he never participated because his father "didn't want to risk me." After Parra's father was arrested in May 2009, Parra assisted "Martinez" in a robbery at 32nd and Central. When Parra was arrested in November 2009, Martinez was one of the passengers in the vehicle.

Detective Blagg testified that he interviewed Ayala -- the woman who lived in the apartment where the shooting occurred. During her interview, she told Detective Blagg that she had previously seen Arciga with Parra's father. Ayala also told the detective that "Miguel" had paid her money for the use of her apartment.

## DISCUSSION

Appellants contend the trial court should have excluded Arciga's out-of-court statements to Alvarez; that it gave erroneous jury instructions; and that it imposed an erroneous sentence on count 1. We address each contention in turn.

A. *The Trial Court did not Err in Admitting Arciga's Out-of-Court Statements to Alvarez.*

The trial court overruled defense objections to the testimony of Alvarez and admitted the testimony under Evidence Code section 1230, as a statement against penal interest. Alvarez subsequently testified that Arciga told him that he (Arciga), Parra's father, and Zuniga were involved in robbing drug dealers (dope rips); that during one such robbery, he had shot a man; and that Parra and Zuniga had been present. Parra and Zuniga contend the admission of Arciga's statements

10

implicating them in the murder of Zarate was error under *Bruton* and violated their Sixth Amendment confrontation rights. For the reasons set forth below, we reject that argument.

In *People v. Greenberger* (1997) 58 Cal.App.4th 298 (*Greenberger*), this court held that "*Bruton* does not stand for the proposition that all statements of one defendant that implicate another may not be introduced against all defendants in a joint trial." (*Id*. at p. 332.) We concluded that out-of-court statements implicating a codefendant may be admitted at a joint trial without denying the codefendant's right to confrontation, if the statements "satisfy the statutory definition of a declaration against interest and likewise satisfy the constitutional requirement of trustworthiness." (*Ibid*.) Arciga's statement to Alvarez satisfied each of these requirements and thus was admissible.

Under California law, a statement is a declaration against interest if "the declarant is unavailable as a witness and the statement, when made, . . . so far subjected him to the risk of civil or criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true." (Evid. Code, § 1230.) Here, Arciga was unavailable as a witness because he exercised his right not to testify at trial. His admission that he shot a drug dealer was a declaration against penal interest because it subjected him to criminal liability for Zarate's death. In addition, Arciga's statement met the trustworthiness requirement because it was made immediately after the murder in the context of a conversation between two acquaintances. As we observed in *Greenberger*, "the most reliable circumstance is one in which the conversation occurs between friends in a noncoercive setting that fosters uninhibited disclosures." (*Greenberger*, *supra*, 58 Cal.App.4th at p. 335.) Arciga's statements to Alvarez met that criterion. Thus, the trial court did not err in admitting the statements.

Parra and Zuniga contend that Arciga's statements should have been sanitized to omit references to them. We disagree. In *People v. Samuels* (2005) 36 Cal.4th 96, the California Supreme Court held that the trial court did not err in admitting an unavailable declarant's remark that "'He had done it [killed the victim] and Mike [Silva] had helped him. And that [the defendant] had paid him.'" (*Id.* at p. 120.) The court rejected the defendant's argument that the declarant's assertion that "'[defendant] had paid him'" for the killing was either collateral to the declarant's statement against penal interest or an attempt to shift blame: "This admission, volunteered to an acquaintance, was specifically disserving to [declarant's] interests in that it intimated he had participated in a contract killing -- a particularly heinous type of murder -- and in a conspiracy to commit murder. Under the totality of the circumstances presented here, we do not regard the reference to defendant incorporated within this admission as itself constituting a collateral assertion that should have been purged from [the witness's] recollection of [declarant's] precise comments to him. Instead, the reference was inextricably tied to and part of a specific statement against penal interest." (*Id.* at p. 121.) Here, Arciga's references to Parra and Zuniga were in the context of a scheme in which all three men set out to rob drug dealers. During one such robbery, a shoot-out occurred. Thus, the references to Parra and Zuniga were inextricably tied to and part of Arciga's statement against penal interest. In any event, any error was harmless. Zuniga himself later admitted to Alvarez that he was present. The victims testified that all three men were present during the incident, and forensic evidence placed them at the crime scene. In short, there was no reasonable probability of a more favorable outcome had Alvarez's testimony been sanitized.

12

B.      *The Trial Court Properly Instructed the Jury.*

1.      *The Trial Court did not Err by not Instructing on Lesser Included Offenses.*

Both juries were instructed on felony murder, first degree felony-murder, and first degree felony-murder as an aider and abettor.  Aside from felony murder, the juries were not instructed on any other theory of murder.  Appellants contend the trial court erred when it failed to instruct, sua sponte, on the lesser included offenses of second degree murder and voluntary manslaughter.

"[A] trial court errs if it fails to instruct, sua sponte, on all theories of a lesser included offense which find substantial support in the evidence.  On the other hand, the court is not obliged to instruct on theories that have no such evidentiary support." (*People v. Breverman* (1998) 19 Cal.4th 142, 162.)  "[T]he existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury.  [Citations.]  'Substantial evidence' in this context is '"evidence from which a jury composed of reasonable [persons] could . . . conclude[]"' that the lesser offense, but not the greater, was committed." (*Ibid*., quoting *People v. Flannel* (1979) 25 Cal.3d 668, 684.)

We independently review a trial court's failure to instruct on a lesser included offense.  (*People v. Licas* (2007) 41 Cal.4th 362, 366; *People v. Posey* (2004) 32 Cal.4th 193, 218.)  However, "[i]n deciding whether there is substantial evidence of a lesser offense, [we do] not evaluate the credibility of witnesses, a task for the jury." (*People v. Breverman*, *supra*, 19 Cal.4th at p. 162.)

Zuniga contends there was substantial evidence from which a jury could conclude that appellants went to the Bellflower apartment to engage in a drug sale,

13

not to commit a burglary or a robbery. He argues there was no burglary because Ayala gave Arciga permission to use the apartment, and there was no robbery by force or fear, but rather "a drug deal gone bad," as Rojas told Detective Blagg when he was interviewed at the hospital after the shooting. We disagree. Ayala expressly denied giving anyone permission to use the apartment to conduct drug sales or to rob drug dealers. At trial, Rojas testified that when Gutierrez was counting the money, he heard, "This is a stick up," before appellants drew their guns. Thus, Rojas's trial testimony did not suggest that the shooting was the result of a drug deal gone bad.

Appellants also contend there was substantial evidence to support voluntary manslaughter based on unreasonable self-defense. They argue Rojas told Detective Blagg that Zarate had pulled out a handgun at the same time appellants did. In addition, the forensic evidence suggests that Zarate fired a shot. Finally, Arciga's jury heard Arciga's interview, in which he told the officers that Zarate drew his gun before Zuniga drew his. However, at trial, Rojas testified consistently that Zarate was shot before he could draw his gun. Additionally, Vasquez testified that Zuniga started shooting without any provocation; Vasquez was walking toward Gutierrez to assist her in counting the money when Zuniga started shooting. As to Arciga's self-serving statement that Zarate drew a gun first, no other evidence supports this factual scenario. Moreover, in the same interview, Arciga stated he was unarmed and acting only as a lookout, evidence contradicted by extensive trial testimony. Specifically, Vasquez testified that Arciga shot Zarate multiple times and continued shooting after Zarate had fallen to the ground. On this record, we conclude Arciga's statement did not constitute substantial evidence to support an instruction on voluntary manslaughter.

14

Arciga separately contends he was entitled to a second degree felony-murder instruction, as his action in checking the marijuana constituted substantial evidence supporting an inference that he did not intend to aid and abet the robbery. He argues that if he had wanted to aid and abet the robbery, "it would not have mattered whether the drugs passed inspection." We conclude Arciga's conduct was insufficient to support an instruction on the lesser included offense of second degree felony-murder. Appellant's inspection of the product assisted the robbery, as it lulled the sellers into believing the encounter was a typical drug sale. Arciga's subsequent conduct, as attested to by the victims, demonstrated that he had the intent to rob the victims, or at the least, to aid and abet in the robbery.

In any event, any error was harmless under the standard articulated in *People v. Watson* (1956) 46 Cal.2d 818, 837 (*Watson*). (See *People v. Breverman*, *supra*, 19 Cal.4th at p. 178 [in a noncapital case, error in failing sua sponte to instruct on lesser included offenses is reviewed for prejudice exclusively under *Watson*].) Here, after an examination of the entire record, it is not reasonably probable that appellants would have obtained a more favorable outcome had the juries been instructed on the lesser included offenses. In returning true findings on the robbery and the burglary special circumstances allegations as to all appellants, the jury necessarily rejected (1) Zuniga's theory that Ayala had given permission to use the apartment; (2) appellants' unreasonable self-defense theory; and (3) Arciga's theory that he did not share an intent to rob and aid the victims. As a murder committed in the perpetration of a robbery or a burglary is first degree murder (see § 189), the jury necessarily found beyond a reasonable doubt that appellants were guilty of first degree felony-murder. (See *People v. Elliot* (2005) 37 Cal.4th 453, 476 [trial court's failure to instruct on second degree murder harmless beyond a reasonable doubt because "the true finding as to the attempted-robbery-murder

15

special circumstance establishes here that the jury would have convicted defendant of first degree murder under a felony-murder theory, at a minimum, regardless of whether more extensive instructions were given on second degree murder"]; *People v. Koontz* (2002) 27 Cal.4th 1041, 1086-1087 [any error in failing to instruct the jury on the definition of manslaughter and the doctrine of unreasonable self-defense harmless, as jury necessarily rejected the unreasonable self-defense theory in returning a true finding on the robbery special-circumstance allegation].)

Unlike the circumstances in *People v. Campbell* (2015) 233 Cal.App.4th 148, relied on by Zuniga, here, there was substantial evidence that appellants committed a robbery or intended to aid and abet one. The victims testified that appellants robbed them at gunpoint. No evidence suggested any appellant was unaware he was going to the apartment to rob drug dealers. During the police interview, Arciga told the officers he acted only as a lookout during the incident, but admitted knowing he was going to an apartment with a group to rob drug dealers. (Cf. *People v. Campbell*, *supra*, at pp. 155-156 [appellant testified at trial he did not go with codefendant to commit a robbery].) Finally, although Parra presented a mistaken identity defense -- that it was his father who committed the crimes -- the verdicts demonstrated the jury did not believe his defense. "Once the jury concluded that the defendant was the perpetrator, . . . the special circumstance finding meant that the jury would not have found the defendant guilty of a lesser included offense." (*Id.* at p. 169.) In short, any error in failing to instruct on lesser included offenses was harmless.

2. *The Trial Court did not Err in not Instructing the Jury on Self-Defense.*

In a related contention, Arciga and Zuniga argue the trial court erred in not instructing the jury on self-defense, based on evidence suggesting that Zarate drew

16

his gun first or at the same time as appellants. For the same reasons discussed above, there was no substantial evidence to support the giving of this instruction. At trial, Rojas testified consistently that Zarate was shot before he could pull out his handgun. Vasquez testified that Zuniga fired his gun without provocation. Only Arciga's jury heard his statement to the police that Zarate drew his gun first, but the statement was unsupported by any other evidence. On this record, no substantial evidence supported an instruction on self-defense.

3. *No Error Occurred with Respect to the Instructions on the Special Circumstances Allegations.*

The jury for Parra and Zuniga was instructed with CALJIC No. 8.80.1 as follows:

> "If you find a defendant in this case guilty of murder of the first degree, you must then determine if one or more of the following special circumstances are true or not true.
>
> "The People have the burden of proving the truth of a special circumstance. If you have a reasonable doubt as to whether a special circumstance is true, you must find it to be not true.
>
> "[¶] . . . [¶]
>
> "If you find that a defendant was not the actual killer of the human being or if you are unable to decide whether the defendant was the actual killer or an aider and abettor or a co-conspirator, you cannot find the special circumstance to be true as to that defendant unless you are satisfied beyond a reasonable doubt that such defendant with the intent to kill, aided, abetted, counseled, commanded, induced, requested or assisted any actor in the commission of the murder in the first degree or with reckless indifference to human life and as a major participant aided, abetted, counseled, commanded, induced, solicited, requested or assisted in the commission of the crime of *robbery or burglary* which resulted in the death of a human being, namely, Carlos Zarate." (Italics added.)

17

The jury also was instructed on robbery with CALJIC Nos. 9.40, 9.42, and 9.42.1; on burglary with CALJIC Nos. 14.50, 14.51, and 14.52; and on circumstantial evidence with CALJIC Nos. 2.00 and 2.01.

The jury verdict forms had separate entries for each special circumstance allegation. As to each appellant, the jury found that the murder of Zarate was committed during the commission of a robbery and during the commission of a burglary.

Parra and Zuniga contend the trial court prejudicially erred in failing to provide proper and complete instructions on the special circumstances allegations. Specifically, they contend that the instructions (1) did not specify what special circumstances the jury was to consider; (2) did not set forth the elements of the robbery and burglary special circumstances; and (3) did not instruct the jury on how to evaluate circumstantial evidence in determining the special circumstances allegations. We disagree.

First, as given here, CALJIC No. 8.80.1 informed the jury that the special circumstances were robbery and burglary. Moreover, the jury verdict forms set forth that the special circumstances were robbery and robbery, and the jury marked "TRUE" next to each special circumstance allegation on the verdict form. On this record, no reasonable jury would have been confused about what special circumstances should be considered.

Second, although CALJIC No. 8.80.1 did not set forth the elements of robbery and burglary, the jury was instructed about the elements of robbery and burglary in other jury instructions. Thus, when the instructions are considered as a whole, no reasonable jury would have been confused about what elements constitute the offense of robbery or burglary. (See *People v. Rhodes* (1971) 21 Cal.App.3d 10, 20 ["fact that the necessary elements of a jury charge are to be

18

found in two instructions rather than in one instruction does not, in itself, make the charge prejudicial"].)

Similarly, although the jury was not instructed with CALJIC Nos. 8.83 and 8.83.1 on considering circumstantial evidence to determine the special circumstance allegations, the jury was instructed with CALJIC Nos. 2.00 and 2.01, the general instructions on evaluating circumstantial evidence. The California Supreme Court has held that CALJIC Nos. 8.83 and 8.83.1 are duplicative of CALJIC No. 2.01. (See *People v. Hines* (1997) 15 Cal.4th 997, 1051 [trial court need not instruct on CALJIC Nos. 8.83 and 8.83.1 where the jury was instructed with CALJIC No. 2.01].)

We also reject appellants' related contention that the trial court should have instructed the jury sua sponte with CALJIC No. 8.81.17, the felony-murder instruction. That instruction generally provides that to find the special circumstance allegation true, the jury must find (1) that the murder was committed while the defendant or an accomplice was engaged in the commission of another felony, and (2) that the other felony was not merely incidental to the commission of the murder. Here, the first part of CALJIC No. 8.81.17 was duplicative of CALJIC No. 8.80.1 as given. As to the second part of CALJIC No. 8.81.17, it must be given only where evidence would suggest that the robbery or burglary was merely incidental to the murder. (See *People v. D'Arcy* (2010) 48 Cal.4th 257, 297 ["trial court has no duty to instruct on the second paragraph of CALJIC No. 8.81.17 unless the evidence supports an inference that the defendant might have intended to murder the victim without having had an independent intent to commit the specified felony"].) Here, no substantial evidence suggested appellants intended to kill Zarate, but not rob him of money and/or drugs. Thus, the trial court had no duty to instruct with CALJIC No. 8.81.17.

19

4.      *The Trial Court did not Err in Failing to Give Accomplice Corroboration Instructions.*

Under section 1111, "[a] conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.  An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given."  Thus, "[i]f sufficient evidence is presented at trial to justify the conclusion that a witness is an accomplice, the trial court must so instruct the jury, even in the absence of a request."  (*People v. Brown* (2003) 31 Cal.4th 518, 555.)

Parra and Zuniga contend the trial court erred in failing to instruct that Arciga was an accomplice and that his out-of-court statements to Alvarez were subject to the accomplice corroboration rule.  Parra also contends the court should have provided an accomplice corroboration instruction with respect to Zuniga's statements to Alvarez.  Zuniga separately contends the court should have provided an accomplice corroboration instruction with respect to Parra's out-of-court statements to officers in November 2009.  Both appellants further contend that the victims -- Gutierrez, Rojas, and Vasquez -- also were accomplices, and that their testimony was subject to the accomplice corroboration rule.  We independently review appellants' contentions.  (*People v. Cole* (2004) 33 Cal.4th 1158, 1210.)

In *People v. Brown*, the California Supreme Court held that no corroboration was necessary where the statements of an accomplice were admissible as declarations against interest.  (*People v. Brown, supra,* 31 Cal.4th at p. 556 [where accomplice's statements were sufficiently trustworthy to permit their admission as

20

declarations against interest, "no corroboration was necessary, and the court was not required to instruct the jury to view [the] statements with caution and to require corroboration"].) Here, Arciga's statements were admissible as declarations against penal interest (Evid. Code, § 1230). Thus, the trial court was not required to provide an accomplice corroboration instruction with respect to such statements.

Similarly, Zuniga's statements to Alvarez also were admissible as declarations against penal interest. Zuniga stated that he, not Arciga, shot the drug dealer. He made the statement to an acquaintance in a noncoercive setting. Under *Greenberger*, Zuniga's statements were sufficiently trustworthy to be admissible despite the hearsay rule. Under *People v. Brown*, those same statements did not require corroboration.

In addition, Zuniga's statements to Alvarez did not implicate Parra in any crime. Testimony is subject to the accomplice corroboration rule only when it is used as substantive evidence of guilt. (*People v. Williams* (1997) 16 Cal.4th 153, 245; *People v. Andrews* (1989) 49 Cal.3d 200, 214.) Thus, Parra cannot claim error with respect to the trial court's failure to provide an accomplice corroboration instruction regarding Zuniga's statements.

Similarly, Zuniga cannot claim error with respect to Parra's statements to the police following his arrest in November 2009. Parra's statements did not implicate Zuniga in any of the charged crimes.

Finally, with respect to the victims, their testimony was not subject to the accomplice corroboration rule because they were not accomplices. As set forth in section 1111, an accomplice is a person "who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." Gutierrez, Rojas, and Vasquez were not liable for any crimes charged in the amended information. Thus, the trial court

21

was not required to provide instructions on the accomplice corroboration rule with respect to their testimony.

C.    *There was no Cumulative Error.*

Finally, appellants contend that even if harmless individually, the cumulative effect of the claimed trial errors mandates reversal of their convictions.  Because we have found no errors, their claim of cumulative error fails.  (See *People v. Seaton* (2001) 26 Cal.4th 598, 639; *People v. Bolin* (1998) 18 Cal.4th 297, 335.)

D.    *Appellants were Properly Sentenced.*

Appellants contend their sentences on count 1 are legally incorrect.  They argue that the sentence for first degree murder with a special circumstance is life imprisonment without the possibility of parole.  However, the trial court's oral pronouncement of judgment reflects that appellants were sentenced to 25 years to life without the possibility of parole on count 1.  Arciga initially requested that this court correct the sentence, but in his reply brief, joined Parra's request that we remand for resentencing.  The People concede the correct sentence is life imprisonment without the possibility of parole, and that the trial court orally imposed an unauthorized sentence on count 1.  However, the People argue that no resentencing or correction is needed, as the correct sentences are reflected in the minute orders and the abstracts of judgment.

Parra further contends that his sentence on count 2 is unauthorized.  He contends the correct sentence is 28 months, but the trial court orally imposed a three-year-and-four-month term.  The People concede the correct term is 28 months, but argue no resentencing is necessary because the minute order and abstract of judgment reflect the correct term.

Appellants do not contest that the minute orders and abstracts of judgment correctly reflect lawful sentences.  Although the general rule is that the oral

pronouncements of the court are presumed correct (see *People v. Mesa* (1975) 14 Cal.3d 466, 471), under these circumstances we will deem the minute orders and abstracts of judgment to prevail over the reporter's transcript. (See *People v. Cleveland* (2004) 32 Cal.4th 704, 768 [where trial court imposed an unauthorized sentence enhancement, but the minute order and abstract of judgment properly did not include the enhancement, "we will deem the minute order and abstract of judgment to prevail over the reporter's transcript"]; accord, *People v. Thompson* (2009) 180 Cal.App.4th 974, 978 [correct calculation of term was reflected in court's minutes and abstract of judgment; erroneous statements in reporter's transcript are of no effect].) Thus, resentencing is unnecessary.

## DISPOSITION

The judgments are affirmed.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

MANELLA, J.

We concur:

EPSTEIN, P. J.                    COLLINS, J.